**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **TRACEY SKOBEL,** | : | **CASE NO. 1:11-CV-0748** |
| | : | |
| **Plaintiff,** | : | **MAGISTRATE JUDGE** |
| | : | **VERNELIS K. ARMSTRONG** |
| **vs.** | : | |
| | : | **MEMORANDUM OPINION** |
| **MICHAEL J. ASTRUE,** | : | **AND ORDER** |
| | : | |
| **Defendant.** | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 1383(c)(3)  of Defendant's final

determination denying her claim for Supplemental Security Income (SSI) under Title XVI of the

Act, 42 U. S. C. §§ 1381(a) and 1382(c).  On August 9, 2011, the parties to this action consented

to have the undersigned Magistrate adjudicate all further proceedings and enter judgment in this

case pursuant to 28 U.S.C. § 636 (c) and Fed.R.Civ.P. 73 (Docket No. 14).   Pending are the

parties' briefs on the merits (Docket Nos. 18 & 19).  For the reasons that follow, the Magistrate

Orders that the Commissioner's Decision be Affirmed in part and Reversed in part and

Remanded to Commissioner for further proceedings consistent with this Opinion..

## I.  Procedural Background

The Plaintiff, Ms. Tracey Skobel, filed her current application for Supplemental Security

Income on February 13, 2007[1] (Tr. 124-127).  Plaintiff alleged a disability onset date of July 15,

2000.  Previously, in February, 2002, Plaintiff had filed a Title XVI application which was

denied (Tr. 12, 95-103).  In the instant case, the ALJ determined  that there was new and material

evidence to consider with Plaintiff's current application and, therefore, under Drummond v.

Commissioner, 126 F.3d 837 (6th Cir. 1997) the ALJ she was not bound by the findings or

ultimate decision of the 2002 case (Tr. 2).  Accordingly, the ALJ independently reviewed the

current application on its own merits (Tr. 12).

In the instant case Plaintiff's application was denied initially and upon reconsideration

(Tr. 106-108, 112-114).

Plaintiff  filed a request for hearing before an Administrative Law Judge (ALJ).  Her case

was assigned to ALJ Traci M. Hixson (Tr. 115, 32-45).  On October 6, 2009, a hearing was

conducted before ALJ Hixson which included testimony from vocational expert Nancy Borgeson

and the Plaintiff, who was represented by counsel (Tr. 54-91). On January 28, 2010, the ALJ

issued a Notice of Decision- Unfavorable,  finding that Plaintiff's impairments did not prevent

her from performing a restricted range of sedentary work and that there were a significant

number of jobs in the national economy for someone with Plaintiff's limitations (Tr. 9-28).

Plaintiff objected to the ALJ's findings and requested review of the hearing decision (Tr.

6-8).  Finding no basis for review, on February 25, 2011, the Appeals Council issued a Notice of

Action, leaving the hearing decision as the final decision of the Commissioner (Tr. 1-3). Plaintiff

---

[1]  In her Brief on the Merits Plaintiff states that she filed her current application on
November 8, 2006.  This date appears to refer to a statement that Plaintiff made that she was
neither accused nor convicted of a felony nor an attempt to commit a felony nor was she on
parole or probation as of November 8, 2006 (Tr.125).

is before this Court seeking judicial review pursuant to 42 U.S.C. Section 1383(c).

## II.  Jurisdiction

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to

42 U.S.C. § .1383(c)(3)  McClanahan v. Commissioner of Social Security, 474 F.3d 830, 832-33

(6th Cir. 2006).

## III.  Factual Background

### A.  Plaintiff's History

Plaintiff was born on October 11, 1967, making her 32 years old as of the date that she

alleged she became disabled and 39 years old as of the date her application was filed (Tr. 124,

131).  She completed school through the tenth grade with special education services.  She has

past relevant work as a fast food worker and pizza delivery person (light and unskilled) (Tr. 82,

156, 161, 163, 685-732).  Plaintiff last worked in 2000 (Tr. 69).

### B.  Relevant Medical Evidence and Opinion

#### 1.  Physical Condition

●Plaintiff has history of low back pain and depression, as well as obstructive sleep apnea, right
knee pain and depression.

**MetroHealth Medical Center**
●October, 2005, Plaintiff began treatment for low back pain  MRI noted a slight disc bulge on
the right at the L4-L5 level, causing minimal neural foraminal encroachment with degenerative
changes and disc bulge at L3-L4, without significant canal stenosis (Tr. 355).
●Plaintiff underwent another MRI which indicated multilevel degenerative disc disease without
central canal or foraminal stenosis (Tr. 281). Overall, the appearance was unchanged from the
October 2005 MRI (Tr. 281).
●February, 2006, Plaintiff received epidural steroid injections at L5-S1. Plaintiff reported that
the injections only provided short term pain relief (Tr. 454, 394, 387).  At this time, she was
taking six Percocet per day (Tr. 394)
●March 7, 2006, Plaintiff returned with complaints of pain. Examination showed decreased
range of motion and tenderness  (Tr. 281, 296-297).
●November 2006, Plaintiff presented with continued complaints of low back pain and radiation

into her right lower extremity.  She appeared in distress, was unable to sit still, and needed frequent changes of position. Objectively, she exhibited marked limitations in range of motion, was very tender on palpation and decreased sensation was noted on the left lateral thigh. She was diagnosed with lumbar spondylosis, with probable SI joint dysfunction (Tr. 301-302)

●November 2006, Plaintiff was diagnosed with lumbar spondylosis, with probable SI joint dysfunction after she presented with continued lower back pain, limited range of motion, and needing frequent changes of position (Tr. 301-302). On exam, her reflexes and motor skills were normal and she was able to heel to toe walk (Tr. 302).

●January 16, 2007, Plaintiff stated her pain medication was not working.  Complaints of constant pain continued, including radiating right lower extremity pain, and numbness and tingling of the right foot (Tr. 305-306).

●May 22, 2007, EMG was done. Findings were noted as "unobtainable in the lower extremity due to swelling, or early sign of peripheral neuropathy" (Tr. 374).

●July 2007, Plaintiff stated that pain prevented her from performing daily activities for the past month (Tr. 362).

●August 1, 2007, A lumbar discogram was positive at the L4-L5, L5-S1 level, but there was no evidence of radiculopathy or neuropathy in Plaintiff's lower extremities (Tr. 360, 375). Examination revealed marked limitation in range of motion, back tenderness, and decreased sensation in the left lateral thigh (Tr. 360).  She had full motor skills in both lower extremities and normal reflexes (Tr. 360).

●November 16, 2007, office visit, Plaintiff reported that she could stand for 15 minutes, sit for 15 minutes, and walk for five minutes (Tr. 550).

●May 2008, a physical exam showed lumbar spine tenderness and some SI joint tenderness (Tr. 590). Although she had slightly decreased motor skills, Plaintiff's sensation was intact bilaterally (Tr. 590).

●November 2008, Plaintiff claimed no relief from her low back pain, and the  record reflects prescriptions for a variety of pain medications, including Ultram, Flexeril, Neurontin, Percocet and Lyrica, all with little or no relief. Additionally, Plaintiff had physical therapy, occupational therapy, pool therapy, nerve blocks, and trigger point injections (Tr.567, 654, 663, 665).

●March, 2009, an updated MRI  indicated multilevel degenerative disc disease of the lumbar spine. Plaintiff continued to use Vicodin for pain (Tr. 644-645).

●April, 2009, an MRI of Plaintiff's lumbar spine showed no significant changes when compared to the March 2006 MRI (Tr. 661-662).

●July 2009, Plaintiff reported worsening back pain radiating into her right hip and knee and a TENS unit was prescribed (Tr. 636). The TENS unit "allow[ed] her to move better" (Tr. 636).

**Dr. Jeffrey Vasiloff** - **State Agency Physician**, M.D.

●May 2007, state agency physician Jeffrey Vasiloff**,** M.D., reviewed Plaintiff's file and assessed Plaintiff's physical abilities (Tr. 346-353), determining that Plaintiff could frequently lift 10 pounds, stand for at least 2 hours in an eight-hour workday, sit for about 6 hours in an eight-hour workday, and that she was limited in her ability to push and pull in her lower extremities (Tr. 347). He stated that Plaintiff could occasionally climb ramps and stairs, but could not climb ladders, ropes, or scaffolds, and she could not kneel or crawl (Tr. 348).  Dr. Vasiloff specifically

4

noted that the March 2006 MRI showed multilevel degenerative changes, but not significant canal or neural foraminal stenosis (Tr. 348). He further observed that Plaintiff had normal reflexes in her knees and ankles, but reduced range of motion and back tenderness (Tr.348). He adopted the ALJ's 2002 RFC determination, which indicated that Plaintiff could perform simple, routine sedentary tasks with a sit/stand option, and that did not include various postural limitations (Tr. 102, 347).

**Dr. W. Jerry McCloud, M.D. - State Agency Physician,**
●November 2007, state agency physician, W. Jerry McCloud, M.D., reviewed Plaintiff's file and assessed her physical abilities (Tr. 532-539). Dr. McCloud stated that he adopted the ALJ's 2004 residual functional capacity assessment (Tr. 533).[2] This RFC indicated that Plaintiff was capable of performing simple routine sedentary work with a sit/stand option, lifting no more than 10 pounds frequently, standing and walking for 2 hours in an eight-hour workday, sitting for 6 hours in an eight-hour workday, no squatting, kneeling, crawling, use of foot controls, climbing ladders/ropes/scaffolds, and no work around unprotected heights and dangerous machinery, and only occasional use of ramps/stairs (Tr. 102, 533).

**Dr. Christopher Najarian, M.D.**
●May, 1 2008, Dr. Najarian determined that there was multilevel disc disease but no significant canal or neural foraminal stenosis (Tr. 590). There was no need for surgical intervention (Tr. 591).

**Dr. David A. Ryan, M.D.**
●January 2009, Dr. Ryan performed a nerve block injection on Plaintiff at the L5 level for her back pain (Tr.653-655).  Dr. Ryan, was concerned that Plaintiff seemed "fixated on opiods [sic]" and that she was taking more medication than prescribed (including using other people's pain medications) (Tr. 655). Dr. Ryan stated that the pain may have been well controlled when Plaintiff was taking her neuropathic pain medication (Tr. 655).

### 2.  Mental Condition

**Mental Health Treatment at Murtis Taylor**
●October 17, 2006 to October 27, 2007 Plaintiff was diagnosed with depression. Plaintiff presented at the emergency room with chest pain, depression, and suicidal ideation and was hospitalized (Tr. 211-251).  Plaintiff was hospitalized for chest pain and depression after a suicide attempt (Tr. 211-251). Her evaluation at Murtis Taylor included complaints of crying spells, difficulty sleeping, decreased concentration and suicidal ideation with a diagnosis of

---

[2]  .The record does not contain a 2004 ALJ residual functional capacity assessment. However, Dr. McCloud's assessment is identical to the ALJ's February 2002 residual functional capacity assessment.  It appears that Dr. McCloud accidentally stated that he concurred with a 2004 ALJ decision, as opposed to the 2002 decision

Major Depressive disorder, recurrent, severe with psychotic features was made and a GAF of 48[3] given, indicative of severe symptoms (Tr. 259-269).  Plaintiff reported being overwhelmed with stress at home (Tr. 230). Plaintiff was treated with supportive psychotherapy, mood stabilizers, and group therapy and was discharged "much improved," with no suicidal ideation, an even mood, and no pain complaints (Tr. 231).

●May, 2007, several months later, Plaintiff continued to exhibit some signs of depression and low energy (Tr. 318-319). Mood stabilizing medications continued to be prescribed but Plaintiff infrequently took the medications (Tr. 318-319).  Plaintiff returned to Murtis Taylor, and diagnosis remained Major Depressive disorder, recurrent, with a GAF of 48. Her appearance, affect and mood were all noted (Tr. 318-319).

**Mitchell Wax, Ph.D. - Consultative Psychologist Examiner**

●May 3, 2007, Mitchell Wax, Ph.D., conducted a consultative psychological examination of Plaintiff (Tr. 322-27). Plaintiff told Dr. Wax that her medical problems (including her back pain and depression) did not allow her to work but Dr. Wax observed that she did not appear to be in any pain during the examination (Tr. 322, 327). Plaintiff's appearance was shabby, disheveled and unkempt, and she had an intense, terrible body odor (Tr. 323). Plaintiff appeared tired, listless, did not smile, and only related marginally to the examiner (Tr. 323). Plaintiff reported difficulty sleeping, feelings of hopelessness, trouble concentrating, and poor energy (Tr. 322-27). Plaintiff's speech was pressured and slow and her affect was blunted (Tr. 322-27).  Plaintiff reported that she cooked daily, washed the dishes, did laundry, vacuumed, and grocery shopped (Tr. 325). Dr. Wax assessment included that Plaintiff had an excellent memory and no deficit in concentration (Tr. 324). She had sufficient judgment to make important decisions about her future and could maintain her own living arrangements (Tr. 324-25). Dr. Wax diagnosed major depression, without psychotic features (Tr. 326). Dr. Wax noted preoccupation and psychomotor retardation and concluded that Plaintiff's ability to relate to others and withstand the stress and pressures associated with day-to-day work were significantly impaired by her depression. Her ability to understand, remember, and follow instructions was mildly impaired, and her ability to maintain attention, concentration, persistence, and pace were moderately impaired (Tr. 323-327). Dr. Wax stated that he suspected malingering and felt that Plaintiff had a tendency to exaggerate her symptoms or withhold information (Tr. 323). Dr. Wax concluded that Plaintiff had the mental ability to perform some simple, repetitive tasks (Tr. 326).

**Eileen Stolarsky - Social Worker, Catholic Charities**

---

[3]  The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).

●April, 2007, Plaintiff received treatment for her depression from Eileen Stolarsky, social worker with Catholic Charities.  Ms. Stolarsky noted Major Depression. In July 2007, Plaintiff complained of difficulty sleeping with anhedonia, despite taking Cymbalta and Abilify (Tr. 485, 490-491).

## Mental Health Treatment at Murtis Taylor
●May, 2008, Plaintiff's symptoms of depression persisted with complaints of sadness, poor sleep, suicidal ideation and decreased concentration. At that time, her medications were noted to be ineffective (Tr. 740).
●January, 2009, Plaintiff continued to be depressed despite adjustments to her medications (Tr. 737-738).
●July 2009, treatment notes indicate a continued disheveled appearance, with continued crying spells (Tr. 735).
●September, 2009, Plaintiff reported an increase in crying spells, suicidal ideation, irritability and mood swings., her diagnosis remained Major Depressive disorder, and her Zoloft was increased (Tr. 733).

## Leslie Rudy, Ph.D. - State-Agency Psychologist
●May, 2007, state-agency psychologist Leslie Rudy, Ph.D., reviewed Plaintiff's file and assessed Plaintiff's mental abilities (Tr. 328-344).  Dr. Rudy noted that there was evidence of an affective
disorder characterized by anhedonia, sleep disturbance, psychomotor retardation, decreased energy, and a history of substance abuse (Tr. 335, 340). She assessed Plaintiff as having a mild restriction in her activities of daily living, and moderate restrictions in maintaining social functioning and maintaining concentration, persistence, or pace (Tr. 342). Plaintiff had  no episodes of decompensation (Tr. 342). Dr. Rudy adopted the ALJ's RFC assessment of 2002, which found that Plaintiff retained the ability to perform simple, routine tasks with brief and superficial contact with the public and coworkers (Tr. 102, 330).

## Dr. Gregory Noveske, M.D. - Psychiatrist
●July, 2007, Gregory Noveske, M.D., a psychiatrist  performed a one-time examination of Plaintiff and in July 2007, submitted a medical source statement in October, 2007 (Tr. 501-503). Dr. Noveske noted that Plaintiff had reduced ability in concentration, social interaction, and adaption (Tr. 501-503). Dr. Noveske indicated that Plaintiff had an anxious and depressed mood and affect, based on Plaintiff's subjective complaints (Tr. 501-503).
●April, 2009,  Plaintiff was briefly hospitalized after reporting that she was depressed and suicidal (Tr. 624-625). She stated that she was having a difficult time sleeping, had low motivation, hopelessness, and a poor appetite (Tr. 624). Plaintiff reported that she had stopped taking her mood stabilizing medication (Tr. 624). Treatment notes indicated that Plaintiff had been "noncompliant with psychiatric care" (Tr. 624). Plaintiff was treated with therapy and medication, and she showed signs of improvement (Tr. 624).

## Ellen Alaimo - Nurse Practitioner, Murtis Taylor

7

●July, 2009, Ellen Alaimo, nurse practitioner from Murtis Taylor completed a mental RFC evaluation (Tr. 608-609).  She opined that Plaintiff's ability to make work place adjustments was generally fair and reported that Plaintiff would have a poor ability socializing, and  maintaining regular attendance, dealing with stress and completing a normal work day or work week. She stated that Plaintiff's "recurrent major depression is resistant to four medications," and that she has chronic pain and her concentration and ability to do everyday things is impaired (Tr. 608-609).

### C.  Hearing Testimony

#### 1.  Plaintiff's Testimony

Plaintiff testified that her biggest problem was depression (Tr. 69).  At the hearing Plaintiff testified at length about her depression and stated that she felt that her medications were not helping and that  her concentration and memory were affected (Tr.69, 76-77).   Although she had a case manager, she was not in therapy (Tr. 69-70). Plaintiff remarked that she also had back pain (Tr. 70), and stated that stated that she needed to lay down a couple of times a day to help alleviate that back pain (Tr. 79). She described the pain as a dull pain that was always present and had gotten worse over the past few years (Tr. 70, 79).  She stated that pain medication helped ease the pain but did not do enough (Tr. 70-71).

Plaintiff also indicated that she had sleep apnea and had a CPAP machine (Tr. 71).  She also stated that she had right knee pain and left thigh pain (Tr. 71-72). She testified that her low back pain was constant, radiating into her right hip and leg accompanied by a burning and numb sensation (Tr. 70, 72).

Plaintiff said that her leg pain bothered her most when she stood up (71-72). She stated that activities such as standing and walking aggravate her pain (Tr. 70).   She indicated that she elevated her feet when they swelled, but this was not every day (Tr. 81). She testified that she used a cane to help her walk, although no doctor or therapist prescribed or instructed her to use a

cane (Tr. 77, 81).

With regard to activities of daily living, Plaintiff stated that she needed assistance with shopping, dishes, laundry and meals, because she could not tolerate standing for long periods (Tr. 62-63, 66). Plaintiff stated that she had not consumed alcohol in a couple of months (Tr. 73). She remarked that it was painful for her to pick up her 30-pound nephew and that she could stand up for about 10 minutes before it became uncomfortable (Tr. 73-74). She stated that she could walk for 20 minutes and sit for about 30 minutes before it became painful (Tr. 74). She testified that she could rarely bend or kneel down (Tr. 74-75). She could reach her arms in front of herself and overhead and could hold a can or a cup in both hands (Tr. 75).

Plaintiff testified that she lived in a two-story home with her husband and three children (Tr. 58-59).

She said that despite being shy, she did not mind being around people (Tr. 76). Plaintiff testified that she had some trouble concentrating and remembering (Tr. 77). Despite stating that she had some difficulty reading, she stated that she read the newspaper "a lot," and had no trouble ordering off of a menu or reading labels while grocery shopping (Tr. 60-61). She testified that she was not able to conduct her own banking but was able to do simple arithmetic (Tr. 61). She said she played cards with her husband occasionally (Tr. 62). Plaintiff testified that she cooked for the family (Tr. 62). Regarding other daily household chores, e.g., dishes, laundry, etc., she testified that she typically started them and her family would finish (Tr. 62). She said that when she went out she would typically be accompanied by someone else to help her (Tr. 63). She has four dogs and a cat for which she cared, including bending down to give them food and water (Tr. 65). She stated that, generally, she did very little during the day, although there

9

were two friends who would come over and visit (Tr. 64-66).

Typically, Plaintiff went to bed between 7 p.m. and midnight, depending on her mood, and would sleep until 11 a.m. or noon the next day (Tr. 67). She took sleeping medication to help her sleep through the night (Tr. 67).

### 2. Vocational Expert Testimony

The ALJ asked the VE to assume a hypothetical individual with the same age, education and work experience as Plaintiff who could lift 20 pounds occasionally and 10 pounds frequently, but was limited in her ability to push and pull with her lower extremities; could stand and walk for 6 hours, but needed a sit/stand option every thirty minutes; could occasionally climb stairs and ramps, bend, balance, and stoop, but could not kneel or crawl; could reach in all directions and do all tasks with the non-dominant hand, but could only occasionally use the non-dominant hand for grasping; should not be exposed to vibration or hazardous conditions; and who is capable of performing simple, routine tasks with simple, short instructions, making simple work related decisions and having few workplace changes (Tr. 83-84).  The VE answered that there were jobs in the national economy for such a hypothetical person (Tr. 84).

Regarding an additional limitation, that hypothetical person could  lift and carry only 10 pounds occasionally and walking/standing for two hours and sitting for 6 hours (with a sit/stand option), the VE stated that jobs still existed in the national economy (Tr. 86). As to this additional limitation, the VE stated that they would mean the hypothetical individual was limited to sedentary work. Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." Further, by definition, sedentary work involves mostly sitting and infrequent walking. 20 C.F.R. §

416.967(a).

The ALJ also asked what would be the effect on employment if the hypothetical person missed work, had unplanned absences three to four times a month because of depression.  The VE answered that such a person would be unable to sustain full time work (Tr. 87).

Asking about the hypothetical with a limitation that such a person had to elevate her feet two times a week for 30-45 minutes, the VE stated that she could still perform 90% of the jobs at the sedentary level (Tr. 88-89).

Asked to add the condition that the individual needed to lay down at unscheduled times, the VE answered that such an individual would be unable to work (although if she could lay down at lunch, it would not have an affect on the jobs) (Tr. 89-90).

## IV. Analytical Overview: Determining Disability

DIB and SSI are properly awarded only to applicants who are determined to suffer from a "disability."  Colvin v. Barnhart, 475 F.3d 727, 730 (6th Cir. 2007), (citing, 42 U.S.C. § 423(a), (d)).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  Colvin, supra,  (475 F.3d at 729), citing, 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

In determining disability under 42 C.F.R..§§ 404.1520 and 416.920, the ALJ must undertake a five step sequential analysis:

**Step 1**: Determine whether the applicant is  engaged in "substantial gainful activity" at the time benefits are being sought.  If yes,  the applicant is not

11

disabled. If no, then move to step 2.[4]

**Step 2**: Determine whether the applicant suffers from any impairment which, either by itself or in combination with one or several other impairment, is "severe." If there is no finding of a "severe" impairment, then there is no disability. If there is a determination that the applicant suffers a "severe" impairment, move to step 3.[5]

**Step 3**: Determine whether any previously identified severe impairment meets or equals a listing in the Listing of Impairments. If yes, then the applicant is disabled. If no, proceed to step 4.[6]

**Step 4**: Determine if the applicant retains sufficient "residual functional capacity"[7] to allow for the performance of his past, relevant work . If the applicant possesses sufficient residual functional capacity to perform his past relevant work, then there is no disability. If not, move to step 5. [8]

---

[4] Substantial gainful activity is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R § 404.1572(a) and 20 C.F.R § 416.972(b). "Gainful work activity" is work that is usually done for pay or profit, whether or not profit is realized. 20 C.F.R § 404.1572(b) and 20 C.F.R § 416.972(b). If an individual engages in substantial gainful activity that person is determined not to be disabled, regardless of the severity of any otherwise identified impairments, mental or physical.

[5] Under the regulations, an impairment or combination of impairments is "severe"if it significantly limits the individual's ability to perform basic work activities. Impairments are "not severe" where medical and other evidence establish only slight abnormalities, individually or in combination, that have no more than a minimal, adverse effect on the individual's ability to work. . 20 C.F.R § 404.1521 and 20 C.F.R § 416.921.

[6] The previously identified severe impairment or combination of impairments must meet or medically equal an impairment listed in 20 C.F.R Part 404, Subpart P, Appendix 1. 20 C.F.R §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.

[7] A determination of the applicant's residual functional capacity must be done before the determination of whether applicant can perform past relevant work. . 20 C.F.R § 404.1520(e) and 20 C.F.R § 416.920(e). An applicant's residual functional capacity is the ability to perform physical or mental work activities on a sustained basis even though the applicant may suffer limitations from his impairments. In making a residual functional capacity determination all the applicant's impairments, including those impairments that are not severe, must be considered. 20 C.F.R § 404.1520(e), 20 C.F.R §§ 416.920(e) and 416.945.

[8] Past relevant work means work performed either as the applicant actually performed it or as it is generally performed in the national economy either within the past 15 years or 15 years prior to the date the disability must be established. Additionally the work must have lasted long enough for the applicant to have learned the job and for it to have become substantial gainful

**Step 5**: Determine if there are jobs in the current economy that applicant could perform, given the limits of her residual functional capacity and consistent with the applicant's other relevant characteristics.  If there are such jobs, then the applicant is not disabled.  If there are no such jobs, then the applicant is disabled. [9]

See Heckler v. Campbell, 461 U.S. 458, 460, 76 L. Ed. 2d 66, 103 S. Ct. 1952 (1983), see also

Combs v. Comm'r of Soc. Sec., 400 F.3d 353 (6th Cir. 2005),  Jones v. Comm'r of Soc. Sec., 336

F.3d 469, 474 (6th Cir. 2003);  Preslar v. Sec'y of Health & Human Servs., 14 F.3d 1107, 1110

(6th Cir. 1994).  20 C.F.R. § 404.1520 (1982););  Tyra v. Secretary of Health and Human

Services, 896 F.2d 1024, 1028-29 (6th Cir. 1990),. Moon v. Sullivan, 923 F.2d 1175, 1181 (6th

Cir. 1990).

## V. The ALJ's Findings

The ALJ made the following findings:

**1**.  The claimant has not engaged in substantial gainful activity since November 8, 2006[10], the application date (20 CFR 416.971 et seq) (Tr. 14).
**2**.  The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, degenerative joint disease of the right knee, obstructive sleep apnea, depression, history of alcohol abuse and obesity (20 CFR 404.1521, et seq. and 416.921 et seq.) (Tr.14).
**3**.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926) (Tr. 15).
**4**.  After careful consideration of the entire record, I find that the claimant has the residual

---

activity for him.  20 C.F.R §§ 404.1560(b) 404.1565 and 20 C.F.R §§ 416.960(b) and 945.965.

[9]  The determination of whether the applicant can do any work at all must take into consideration the applicants residual functional capacity along with the applicant's age, education and work experience.  At this stage the burden is upon the Commissioner to show that work exists in significant numbers within the economy that the applicant can do, given the applicant's limiting characteristics.  20 C.F.R §§ 404.1512(g) 404.1560(c) and 20 C.F.R §§ 416.912(g) and 945.960(c)    .

[10]  See, footnote no. 1, above.  Plaintiff filed her current application for SSI on February 13, 2007 (Tr. 124-27).

functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) she requires the option to change position every thirty minutes; she can occasionally climb stairs and ramps, bend, balance or stoop; she cannot kneel, crawl or work in environments with vibration or exposure to hazard; she can perform simple repetitive tasks with simple, short instructions and simple work related decisions with few workplace changes (Tr. 16).

**5**.  The claimant is unable to perform any past relevant work (20 CFR 404.1565)(Tr. 21).

**6**.  The claimant was born on December 11, 1967 and was 38 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963)(Tr. 21).

**7**.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964)(Tr. 21).

**8**.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968)(Tr. 21).

**9**.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a)(Tr. 22).

**10**.  The claimant has not been under a disability, as defined in the Social Security Act, since November 8, 2006, the date the application was filed (20 CFR 404.1520(g) and 416.920(g)) (Tr. 22).

## VI. Standard of Review

District Court review of Commissioner of Social Security disability determinations is limited to evaluating whether the decision made by the Commissioner is supported by "substantial evidence" and consistent with applicable, legal standards.  Colvin v. Barnhart , supra, 475 F.3d at 729.  The district court shall affirm  the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  McClanahan v. Comm'r of Soc., 474 F.3d 830 at 833 (citing Branham v. Gardner, 383 F.2d 614, 626-627 (6th Cir. 1967)).  The Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence. Id. (citing 42 U.S.C. § 405(g )).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (citing Besaw v. Secretary of Health and Human Services, 966 F.2d 1028, 1030

14

(6th Cir.  1992)).  <u>See</u> <u>also</u> <u>Cutlip v. Sec'y of Health & Human Servs</u>, 25 F.3d 284, 286 (6th Cir. 1994).

"The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  <u>Buxton v. Halter</u>, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

Moreover, because district court  review of the Commissioner's decision is, essentially, appellate in character, the court is not to undertake <u>de</u> <u>novo</u> review, and is restrained from attempting to resolve evidentiary conflicts as well as from  making credibility determinations. <u>Cutlip</u>, <u>supra</u> 25 F.3d 284, 286 (<u>citing</u> <u>Brainard v. Secretary of Health and Human Services</u>, 889 F. 2d 679, 681 (6th Cir. 1989); <u>Garner v. Heckler</u>, 745 F. 2d 383, 387 (6th Cir. 1984)).   Rather, the reviewing court is bound to affirm the Commissioner's decision, provided that such decision is supported by substantial evidence, even if the court were inclined to have decided the case differently.  <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389-90 (6th Cir. 1999).  Where supported by substantial evidence, the Commissioner's findings must be affirmed, even if there is evidence favoring plaintiff's side.  <u>Listenbee v. Sec'y of Health & Human Servs.</u>, 846 F.2d 345, 349 (6th Cir. 1988).  The decision by the administrative law judge is not subject to reversal even where substantial evidence could have supported an opposite conclusion.  <u>Smith v. Chater</u>, 99 F.3d 780, 781-82 (6th Cir. 1996).

**VII.  Issues Before the Court**

This case raises three issues for review.

Issue No. 1.  Whether the ALJ reasonably evaluated the medical evidence in the whole of the record, and specifically, whether the ALJ unduly relied upon opinions of non-examining

15

physicians that incorporated a 2002 RFC, but failed to assess properly subsequent developments in, and findings regarding, Plaintiff's condition

Issue No. 2. Whether the ALJ reasonably evaluated Plaintiff's allegations of disabling pain and whether the ALJ's assessment of Plaintiff's pain was based on substantial evidence.

Issue No. 3. Whether the ALJ reasonably evaluated Plaintiff's mental restrictions and limitations and whether the ALJ's assessment of Plaintiff's mental condition, including the ALJ's mental RFC of Plaintiff, was based on substantial evidence.

## VIII. Discussion

**Issue No. 1. Whether the ALJ reasonably evaluated the medical evidence in the whole of the record, and specifically, whether the ALJ unduly relied upon opinions of non-examining physicians that incorporated a 2002 RFC, but failed to assess properly subsequent developments in, and findings regarding, Plaintiff's condition**

Issue No. 1 asks the question of whether the ALJ correctly assessed Plaintiff's medical condition and RFC in light of the evidence on the record, including the opinions and observations of the various health care providers who treated, examined or evaluated Plaintiff and, in that light, whether the ALJ correctly weighed the opinions of the state examining physicians and properly considered the full extent of Plaintiff's medical history.

Plaintiff argues that the ALJ erred in granting full weight to the opinions of the state's non-examining, reviewing physicians, because these physicians adopted an RFC from a 2002 hearing decision of a previous Social Security application of Plaintiff and "essentially ignored six years of evidence." (Docket No. 18, p. 8). Plaintiff asserts that the opinions of physicians who have treated a claimant over a substantial period of time are entitled to greater weight than reports of state physicians who merely review a claimant's records for the purpose of defending against a disability claim. See Kirk v. Secretary of Health and Human Services, 667 F.2d 524 (6th Cir.1981), cert denied, 461 U.S. 957 (1983). Plaintiff also notes that treating physicians' opinions are also accorded greater weight than the opinions of examining physicians, who may

16

have encountered a claimant only once.  See  Harris v. Heckler, 756 F.2d 431 (6th Cir. 1985).

Plaintiff's assertions to the contrary, review of ALJ Hixson's January 28, 2010, Decision reveals that the ALJ undertook a thorough review of the whole of the record, including a review of medical and other evidence up to and through Plaintiff's current medical treatment. Moreover, despite Plaintiff's characterization of the state reviewing sources as  physicians who examine a claimant's records "for the purpose of defending against a disability claim" (Docket No. 18, p. 8), state agency reviewing sources are medical professionals and experts in social security, charged with the responsibility of independent review of a claimant's medical history. 20. C.F.R. § 404.1527(f)(2)(I).

Contrary to Plaintiff's claim, state agency reviewing sources did take into account Plaintiff's medical history subsequent to the 2002 RFC assessment.  For example, state agency physician Dr. Vasiloff commented on an MRI of Plaintiff that was taken in March of 2006, which revealed multi-level degenerative changes, but no significant canal or neural foraminal stenosis (Tr. 348).  Dr. Vasiloff also took into consideration evidence from January, 2007, that indicated that Plaintiff had tenderness, positive straight-leg test and reduced range of motion. Id. Additionally, he noted that Plaintiff's medical records showed that she  had normal reflexes in her knees and ankles.  Id.  Dr. Vasiloff may have adopted the 2002 RFC determination - noting that Plaintiff had the capacity to perform simple, routine sedentary tasks with sit/stand options and which did not include various postural limitations - but he did not do so unaware of Plaintiff's subsequent medical history (Tr. 102, 347-48).  Note further that the ALJ considered Dr. Vasiloff's opinions and introduced an additional limitation that was presented at the hearing level which compelled an "additional postural and environmental limitations" (Tr. 21), further

evidencing that the ALJ considered the whole of the record, and specifically changes in Plaintiff's medical condition that took place after 2002.

Additionally, the evaluation done by state agency physician W. Jerry McCloud, M.D., (which is consistent with the opinion of Dr. Vasiloff) also belies Plaintiff's claim that the examining physicians ignored developments in Plaintiff's medical condition, considering that Dr. McCloud concluded that Plaintiff was capable of performing simple, routine sedentary work with a sit/stand option, lifting no more than 10 pounds frequently, standing and walking for 2 hours in an eight-hour workday, sitting for 6 hours in an eight-hour workday, no squatting, kneeling, crawling, use of foot controls, climbing ladders/ropes/scaffolds, and no work around unprotected heights and dangerous machinery, and only occasional use of ramps / stairs (Tr. 102, 532-39).

Additionally, other information from the Plaintiff's medical record supported the ALJ's assessment of Plaintiff's medical condition and her RC determination. Regarding Plaintiff's leg and back pain, the ALJ observed that "the limited and inconsistent diagnostic and clinical findings related to [the Plaintiff's] degenerative disc disease do not support her allegations as to the severity of the impairments." (Tr. 18).

To reach this evaluation the ALJ reviewed the findings form MRIs that Plaintiff had in 2005, 2006 and 2009, which showed multi-level disc degenerative disease but no central canal or foraminal stenosis (Tr. 17-18, 281, 355, 661-62). The ALJ also noted that Plaintiff's medical records indicated that her motor strength, reflexes and gait were consistently normal, notwithstanding back tenderness, range of motion problems and some decreased motor strength (Tr. 18, 302, 360, 590). The ALJ also noted certain inconsistencies between Plaintiff's claims

18

and the objective medical record, for example that, despite her allegations of pain Plaintiff was

non-compliant with her pain medication treatment (Tr. 18, 581). See Social Security Ruling 96-

7p  ("[T]he individual's statements may be less credible if the level or frequency of treatment is

inconsistent with the level of complaints, or if the medical reports or records show that the

individual is not following the treatment as prescribed and there are no good reasons for this

failure.")

> Additionally, the ALJ noted, regarding Plaintiff's spinal condition that
>
> [s]ubsequent MRI examination in April indicated no significant changes (Ex.
> B22F, pp 26-27) A lumbar discogram in June 2007 indicated an annular tear at
> L3-4 (Ex. B10F, p. 113).  Electromyogram of the claimant's extremities in
> August 2007 indicated neuropathy of the claimant's right median nerve consistent
> with carpal tunnel syndrome, a condition which the claimant has alleged no
> functional limitations from, but no evidence of radiculopathy or neuropathy in her
> lower extremities (Ex. B10F, p. 22). . . . After evaluation by an orthopaedic
> surgeon it was determined, based on his essentially normal neurological
> examination of the claimant, she was not a candidate for surgery (Ex. B18F, p.
> 24-25)

(Tr. 18)

Clearly, the ALJ's narrative analysis in her Decision contains the above, and numerous

other examples, of references to Plaintiff's post-2002 medical condition, which clearly

establishes that the ALJ reviewed the whole of the record, including Plaintiff's more current

medical history to reach her RFC assessment of Plaintiff.

Accordingly, this Court finds that the state agency physicians included review of

Plaintiff's post-2002 medical condition, that the ALJ's review included analysis of Plaintiff's

post-2002 medical condition, and that, Plaintiff's claims to the contrary, are not supported by the

narrative content of the ALJ's Decision and that the ALJ's RFC determination was based on a

review of the whole of Plaintiff's medical record and was supported by substantial evidence.

19

**Issue No. 2.  Whether the ALJ reasonably evaluated Plaintiff's allegations of disabling pain and whether the ALJ's assessment of Plaintiff's pain was based on substantial evidence**.

Plaintiff argues that the ALJ erred in her assessment of Plaintiff's pain, stating that, because there is objective evidence supporting Plaintiff's reports of pain, the ALJ failed to apply the correct standard in evaluating Plaintiff's claims of pain and erroneously concluded that Plaintiff's pain did not further disable Plaintiff or erode her residual functional capacity.

Plaintiff argues that the correct method for evaluating a claimant's allegations of pain requires:

1. A determination of whether there is objective medical evidence for the claimants allegation of pain.  If there is no such objective basis, the analysis need not proceed.  However, if there is an objective basis for a claimant's reports of pain, then the assessment must proceed to the next stage which requires, either

      a.  determining whether the (previously identified) objective medical evidence confirms the severity of the pain alleged to have arisen therefrom, or

      b.  determining whether the (previously identified) objective medical evidence is sufficiently severe that it is reasonable to conclude that it caused the pain described by the claimant.

See Duncan v. Secretary of Heath and Human Services, 801 F.2d 847 ((6th Cir. 1986).

In addition to undertaking an examination of the objective medical evidence of a claimant's allegation of pain, the ALJ is also required to assess a claimant's reports of pain utilizing the following six. criteria:

1. The effect of the pain on the claimant's daily activities.

2. The bodily location, amount of time experienced, frequency of occurrence and description of the intensity of the pain.

3. Factors that precipitate or aggravate the manifestation of pain.

4. The use of pain relief medications, including the type, dosage regimen, effectiveness and side effects of such pain relief therapies and medications.

5.  The use of non-medication pain relief therapies, including the type, usage regimen, effectiveness and side effects of such pain relief therapies and medications.

6.  The opinions and statements of claimant's doctors.

See Felisky v. Bowen, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

There is, at a minimum, objective medical evidence for Plaintiff's claims of pain, in general.  Plaintiff has had lower back pain since at least 2005.  MRI evidence - which would constitute the objective medical evidence supporting Plaintiff's reports of pain - showed slight disc bulging causing neuronal foraminal encroachment (albeit minimal) accompanied by degenerative changes at L3-L4 (Tr. 355).  Additionally, Plaintiff has exhibited limited range of motion, tenderness and decreased sensation in her left lower extremity (Tr. 301-02, 360).  An August, 2007 lumbar discogram was positive at L4-L5 and L5-S1 and a March, 2009 MRI showed degenerative disc disease of the lumbar spine (Tr. 636).

In addition, Plaintiff has received various treatments for her pain, including, for example, injections from February, 2006 to January, 2009 and a host of pain relief medications, including Ultram, Flexeril, Neurontin Percocet, Vicodin and Lyrica (Tr. 567, 644-45).  Plaintiff was also outfitted with a TENS unit in July of 2009 (Tr. 636).

The question before the Court is whether the ALJ erred in her analysis of Plaintiff's pain and in her determination that Plaintiff's pain did not rise to the level of a disability.

The question for this Court, however, is not whether Plaintiff experienced pain but whether and on what basis this Court can supplant its judgment for the determination of the ALJ regarding the nature and severity of Plaintiff's pain.  See Cutlip and  Her, supra.  Plaintiff argues that the ALJ did not apply the correct analytical framework for assessing Plaintiff's claims of pain.  See Duncan and Felisky, supra.  Review of the ALJ's January 28, 2010, Decision does not

21

incline this Court to accept Plaintiff's argument.

The ALJ undertook a thorough examination of Plaintiff's claim's of physical disability and her claims of pain.

The ALJ identified degenerative disc disease, disc disease of the lumbar spine, degenerative joint disease of the right knee as several of the severe impairments from which Plaintiff suffers (Tr. 14). The ALJ evaluated the intensity, persistence and limiting effects of Plaintiff's pain and physical condition and determined the extent to which they were supported by the medical record (Tr. 17).  In this light, the ALJ also made a credibility assessment of Plaintiff.  Id.  The ALJ heard testimony from Plaintiff that she experienced constant pain in her back, right knee and left thigh, which were exacerbated by standing.  Id.

The ALJ acknowledged that the Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  Id.  The ALJ found, however, that Plaintiff's statements concerning the intensity, persistence and limiting effects of these conditions were not credible.  Id.

The ALJ noted that Plaintiff's sporadic work history did not provide support for the opinion that Plaintiff was motivated to work.  Id.  The ALJ observed that, while Plaintiff's medical treatment is consistent with Plaintiff's claims regarding back and leg pain, there was an absence of strongly positive clinical signs or diagnostic findings to support Plaintiff's allegations regarding the severity of her impairments.  Id.

The ALJ observed that there were objective findings regarding Plaintiff's back and leg pain due to degenerative disc disease, but that such findings only supported the limitations on exertion, posture and environment as set forth in the ALJ's RFC determination.  The ALJ made

22

this assessment taking into consideration Plaintiff's March, 2006 lumbar spine MRI  (indicating multilevel degenerative disc disease without central canal or foraminal stenosis); the 2009, MRI (which indicated no significant changes in Plaintiff's condition); the lumbar discogram of June 2007 (which indicated an annular tear at L3-L4); the electromyogram of August, 2007 (which indicated neuropathy of Plaintiff's right median nerve consistent with carpal tunnel syndrome) (Tr. 17-18).

The ALJ also acknowledged that Plaintiff's physicians noted the extreme tenderness to palpation, positive straight leg raising, positive axial loading, marked decrease in range of motion of the spine and decreased sensation of the left lateral thigh, but that no motor strength reflex or gait abnormalities were noted (Tr. 18).  Notwithstanding, the ALJ concluded that the "limited and inconsistent diagnostic and clinical findings related to the claimant's degenerative disc disease do not support her allegations as to the severity of her impairments."  Id.  She also found that the conservative treatment modalities utilized by Plaintiff and her physicians were inconsistent with the claimed intensity of impairment.  Id.  In this regard, the ALJ observed that Plaintiff's pain management physician discontinued prescribing narcotic pain medications due to Plaintiff's noncompliance. Id.  The ALJ also observed that an evaluation by an orthopaedic surgeon found an essentially normal neurologic examination which lead to the conclusion that Plaintiff was not a candidate for surgery.  Id.

The ALJ also reviewed other factors, including Plaintiff's obesity, and determined that there was no medical evidence that obesity had any significant effect on Plaintiff's mobility or other limitations not already addressed in the RFC assessment (Tr. 19).

Finally, the ALJ reviewed Plaintiff's claims concerning limitations in her daily activities,

but determined that these did not constitute strong evidence in support of Plaintiff being

disabled, noting that even if she were to accept as true Plaintiff's allegations regarding the extent

to which her daily activities were limited, that it was difficult to attribute Plaintiff's claimed

limitations on her activities to Plaintiff's medical condition and also noting that Plaintiff stated

that she cooked once daily or once or twice weekly and shopped for groceries weekly or

monthly, performed routine household chores such as cleaning, laundry, vacuuming and dishes.

The above review of the ALJ's findings regarding Plaintiff's claims of pain and her

medical condition indicate that the ALJ evaluated Plaintiff's condition in accordance with the

standards announced in Duncan and Felisky, supra.  This being so, the Court finds that there is

no basis to disrupt the ALJ's finding regarding Plaintiff's claims of pain and, therefore,

determines that there was substantial evidence to support the ALJ's conclusion that Plaintiff's

pain did not constitute a disability.

**Issue No. 3.  Whether the ALJ reasonably evaluated Plaintiff's mental restrictions and limitations and whether the ALJ's assessment of Plaintiff's mental condition, including the ALJ's mental RFC of Plaintiff, was based on substantial evidence.**

Plaintiff asserts that the ALJ erred in her evaluation of the significance of Plaintiff's

failure to seek regular mental health treatment (Docket No. 18, p. 12).  Plaintiff states that "[t]he

failure of a patient to obtain regular psychological treatment is a circular argument: such failure

is often more of a symptom than an indication of improper diagnosis."  Id.  Plaintiff goes on to

state that the significance of  "the lack of treatment can cut both ways." (Docket No. 18, p. 13).

Plaintiff notes that consultative examiner Mitchell Wax, Ph.D. determined that Plaintiff had a

major depressive disorder (Tr. 323-26), and that treating nurse practitioner Ellen Alaimo opined

that Plaintiff would have a poor ability to perform in the areas of maintaining attendance, dealing

with stress and completing a normal work day or week (Tr. 608-609) (Docket No. 18, p. 13). Plaintiff also argues that the ALJ should have attributed greater significance to the opinion of nurse practitioner Alaimo pursuant to 20 C.F.R. §§ 404.1513(d) and 416.913(d) that allows for the use of "other sources," including nurse practitioners, whose opinions may "provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." (Docket No. 18, p. 14, citing SSR 06-03p). Plaintiff argues that, at a minimum, the ALJ should have posed to the vocational expert a hypothetical question based on the mental restrictions identified by nurse practitioner Alaimo.

Review of the ALJ decision shows that the ALJ evaluated Plaintiff's mental condition in great detail. As the ALJ indicated, the Decision reflects that she considered Plaintiff's mental impairments singly and in combination and concluded that they did not meet or medically equal the criteria of listing 12.04 (Tr. 15). The ALJ concluded that, with respect to how Plaintiff's mental condition affected her daily living, Claimant had a mild restriction. Id. Notwithstanding Plaintiff's claims to the contrary, the ALJ noted that the record established that Plaintiff was able to attend to her personal care as well as perform some household chores, including shopping for groceries (with some assistance) as well as reading and watching television. Id. The ALJ also noted that with respect to both social functioning and concentration, persistence and pace Plaintiff had moderate difficulties, but that she had a good relationship with her husband and a fair relationship with her children. Id. The ALJ stated that since her October 2006, hospitalization for an exacerbation of her depression, Plaintiff has had no episodes of decompensation of extended duration since November of 2006 (Tr. 16). Pursuant to her analysis of Plaintiff's mental condition, the ALJ stated that the RFC assessment that he made of Plaintiff

reflected the degree of mental function limitation that she found.  Id.

The ALJ observed that Plaintiff's failure to "seek regular mental health treatment and the lack of regularly observed autonomic signs of psychological impairment" were inconsistent with Plaintiff's allegations as to the severity of her mental impairment (Tr. 18).  As Plaintiff noted, above, her not seeking regular mental health treatment can be interpreted as having contrary meaning.  However, this Court cannot substitute it's judgment for that of the ALJ, if there is substantial evidence to support the ALJ's finding.  A review of the record indicates that there is substantial evidence to support the ALJ's determination in this regard.

The ALJ noted that during her October, 2006 hospitalization for complaints of chest pain, depression and suicidal ideation, Plaintiff indicated that she was depressed because her family's home had recently burned down and that the mental status exam at that time indicated that Plaintiff reported depression, crying spells, feelings of hopelessness and helplessness, but she maintained an appropriate affect (Tr. 18).  Plaintiff was treated with therapy and mood stabilizers and discharged with a GAF score of 60, indicative or moderate symptoms.  Id.  The ALJ noted that the Plaintiff continued to exhibit some clinical signs of psychological impairment, e.g., flat affect, hopelessness and anhedonia.  Id. Plaintiff was again hospitalized in April of 2009, for depression and suicidal ideation related to her family's eviction, but during that hospitalization the physician noted that Plaintiff had not been compliant with her medication regimen and when Zoloft and Lamictal were administered Plaintiff's condition improved.  Id.

The ALJ noted that hospital records tended to indicate that medications were effective in reducing Plaintiff's symptoms of depression, but those records also indicated that Plaintiff would not be compliant for significant periods of time (Tr. 19).   In this regard the ALJ determined that

26

Plaintiff's refusal or failure to obtain regular treatment and the absence of regularly observed clinical symptoms of psychological impairment were inconsistent with Plaintiff's allegations of disabling severity of her mental conditions.  Id.

The ALJ discounted the opinion of examining psychiatrist Dr. Noveske - that Plaintiff exhibited reduced ability in concentration and social interaction and adaptation - because Dr. Noveske's opinion was based on only a single examination of Plaintiff and relied heavily on Plaintiff's selective reporting rather than the doctor's own observations.  Id.

The ALJ also discounted the July, 2009, opinion of treating nurse practitioner Alaimo - who noted specific deficiencies in socializing, completing a normal work day or work week without interruption from psychologically based symptoms, and performance at a consistent pace, and maintaining regular attendance and punctuality, which were regarded as poor - because they were inconsistent with the evidence as a whole and because nurse practitioner Alaimo also stated that Plaintiff's abilities to make occupational adjustments, function intellectually, make personal and social adjustments were generally fair (Tr. 19-20).

Additionally, the ALJ reviewed and accorded full weight to the mental health opinions of examining sources Mitchell Wax, Ph.D. and Leslie Rudy, Ph.D., who opined that Plaintiff did not appear to be in pain during his examination (Wax); diagnosis of major depression, without psychotic features (Wax); GAF of 51, indicating moderate symptoms of functional limitations (Wax); Plaintiff's abilities to relate to others and withstand the stress and pressures associated with day-to-day work activity was significantly impaired by her depression (Wax); Plaintiff's ability to understand, remember and follow instructions was only mildly impaired (Wax); malingering was suspected (Wax); there was medical evidence of anhedonia, sleep disturbance,

27

psychomotor retardation, and decreased energy that established Plaintiff's affective disorder (Rudy); mild restriction of activities of daily living and moderate limitations on Plaintiff's ability to maintain social function, concentration persistence and pace (Rudy); Plaintiff maintained the ability to perform simple, routine tasks with brief and superficial contact with the public and coworkers (Rudy) (Tr. 20).

This Court acknowledges that the ALJ undertook a thorough review of Plaintiff's mental health history. Moreover, as noted above, the Court has concluded that the Plaintiff's argument that Plaintiff's failure to seek and maintain regular treatment for her mental health problems is amenable to different interpretations is a bit of a non sequitur, as the evaluation of the evidentiary significance of that fact is well within the authority of the ALJ to determine.

However, the Court is concerned that despite having identified depression as a severe impairment at step two of the sequential analysis (Tr. 14), the ALJ did not include a reference to this condition in her RFC determination (Tr 16) only stating in her narrative discussion of step three of the sequential analysis, addressing Plaintiff's mental impairments (Tr. 15-16), that "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (Tr. 16). However, the ALJ's RFC assessment makes no direct reference to Plaintiff's mental conditions, or the severe impairment of depression, previously identified by the ALJ, and only obliquely refers to Plaintiff's mental function by stating that "she can perform simple repetitive tasks with simple, short instructions and simple work related decisions with few workplace changes." (Tr. 16). Moreover, in her narrative discussion of her RFC determination the ALJ stated that she gave full weight to the opinions of Dr. Mitchell Wax, Ph.D. a consulting, examining psychologist who,

despite having indicated that he "suspected malingering," concluded "[b]ased on his examination of the {Plaintiff] . . . a diagnosis of major depression, without psychotic features." (Tr. 20). Additionally, the Court takes note of the portion of the questioning of VE Borgeson where the ALJ asked whether the hypothetical person "missed work, had unplanned absences three to four times a month because of depression would that impact employment?" and the VE responded that "such a person would be unable to sustain full time work."  (Tr. 87).

All this being said, it is the opinion of this Court that the ALJ's review of Plaintiff's mental health conditions, in particular her diagnosed major depression, and the effect of such condition might have on Plaintiff's ability to work suffers from some apparent inconsistencies. Therefore, for the foregoing reasons, this Court regards the matter raised in Plaintiff's Issue No. 3 as well taken and finds that the ALJ's determination of the effect of Plaintiff's mental health condition, and in particular major depression, was not based on substantial evidence. Accordingly, this Court orders that this case be remanded to the Commissioner for an additional hearing to obtain testimony of a psychological medical expert and a vocational expert regarding Plaintiff's mental health condition, in particular her major depression, and the effect such condition would have on Plaintiff's ability to work.

## IX.  Conclusion

For these reasons, the Magistrate Orders that Court, Affirm the Commissioner's Decision as to the matters raised in Plaintiff's Issues No. 1 and 2 but reverses and remands this case,  for further proceedings consistent with the findings set forth above, regarding the matters raised in Plaintiff's Issue No. 3, concerning the effect of Plaintiff's mental functioning, in particular her

29

diagnosed major depression, on Plaintiff's ability to work.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   April 27, 2012